**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | |
|---|---|
| WILLIAM FLOYD,                     ) | |
|                  Plaintiff,    ) | |
| v.                                              ) | No. 2:11 CV 16 DDN |
| THOMAS CABRERA, et al.,     ) | |
|                  Defendants.  ) | |

**MEMORANDUM**

This action is before the court on the uncontested motion of defendants Thomas Cabrera, Ernest Jackson, Jill Perkins, Robert Jarrett, Ervin Simmons, Corizon, Inc., formerly known as Correctional Medical Services, and Jackson Institutional Dental Services for summary judgment (Doc. 42). The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 26.)

**I. BACKGROUND**

On February 24, 2011, plaintiff William Floyd, an inmate in the custody of the Missouri Department of Corrections ("MDOC"), commenced this action against defendants Thomas Cabrera et al. alleging injuries resulting from the MDOC's provision of medical services. (Doc. 1.) His complaint alleges four counts of claims.

For Counts I and III plaintiff seeks relief under 42 U.S.C. § 1983. Count I alleges that defendants Cabrera, Jackson, Jarrett, Simmons, and Perkins were deliberately indifferent to his medical needs. Count III alleges that the policies, procedures, customs, and official actions of defendants Corizon, Inc. ("Corizon") and Jackson Institutional Dental Services ("JIDS") result in deliberate indifference to the medical needs of inmates. (Id.) Plaintiff invokes 28 U.S.C. § 1343(a)(3) to establish subject matter jurisdiction for these constitutional claims. (Id.)

Counts II and IV allege claims of medical negligence under Missouri law that share a common nucleus of operative fact with Counts I and III. (Id.) Plaintiff invokes 28 U.S.C. 1367 to establish subject matter jurisdiction for his state claims. (Id.)

Plaintiff seeks actual and punitive damages, attorney fees, and costs under 42 U.S.C. § 1988. (Id.)

## II.  MOTION FOR SUMMARY JUDGMENT

Defendants argue that plaintiff failed to present substantial evidence to support Counts I and III. Further addressing Count III, defendants also argue that plaintiff failed to state a claim upon which relief can be granted. Regarding Counts II and IV, where plaintiff alleges medical negligence, defendants argue that summary judgment is appropriate because medical negligence is not a cognizable constitutional claim.

## III. THE UNDISPUTED FACTS

The proffered evidence indicates that the following facts are not disputed. Plaintiff William Floyd is an inmate in the custody of the MDOC, who was, at all times relevant, confined at the Northeast Correctional Center ("NCC"). (Doc. 1 at ¶ 1; Doc. 10 at ¶ 1; Doc. 24 at ¶ 1.) Defendant Corizon contracted with the state of Missouri to provide medical services to correctional institutions. (Doc. 1 at ¶ 8; Doc. 10 at ¶ 8.) Defendant Corizon retained defendant Thomas Cabrera, a medical doctor, as an independent contractor to provide medical care to MDOC inmates. (Doc. 1 at ¶ 3; Doc. 10 at ¶ 3.) Defendant Corizon also employed defendant Jill Perkin, a registered nurse, as the health services administrator at NCC. (Doc. 1 at ¶ 4; Doc. 10 at ¶ 4.) Defendant JIDS, a corporation organized and existing under Missouri law, provides dental services to inmates in the Missouri Department of Corrections. (Doc. 1 at ¶ 7; Doc. 10 at ¶ 7.) Defendant Ernest Jackson, a dentist, is the chief executive officer of JIDS. (Doc. 1 at ¶ 2; Doc. 10 at ¶ 2.) Defendant JIDS retained defendant Robert Jarrett, a dentist, as an independent contractor. (Doc. 1 at ¶ 5; Doc. 10 at ¶ 5.) Defendant Ervin Simmons is an oral and maxillofacial surgeon as well as a dentist, practicing in Missouri. (Doc. 1 at ¶ 6; Doc. 24 at ¶ 2.)

In 2008, plaintiff sustained a gunshot wound to the face that caused injury to his mandible. (Doc. 45-1 at 2-5.) On October 13, 2009, during the initial evaluation following his latest incarceration, plaintiff admitted to smoking one pack of cigarettes a day for the past 20 years, and he weighed 225 pounds. (Id. at 3.) On October 14, 2009, plaintiff saw Dr. Faisal Ahmed. (Id. at 2.) Plaintiff told Dr. Ahmed that he had multiple surgeries to reconstruct his jaw and needed three more surgeries. (Id.) Dr. Ahmed referred plaintiff to the dental department. (Id.)

On October 15, 2009, plaintiff complained of jaw pain that increased when he attempted to eat. (Id. at 4.) His mandible had been reconstructed with plates. (Id.) Plaintiff told Dr. Karanbir Sandhu that he last underwent surgery in February 2009 and that, prior to his incarceration, he had scheduled his next surgery for April 2009. (Id.) Dr. Sandhu requested a referral for an oral surgery consultation. (Id. at 5.) On November 4, 2009, after receiving plaintiff's prior medical records, defendant Jackson approved the referral. (Id.)

On November 2, 2009, because of his inability to eat pears and apples, plaintiff requested documentation for a food substitution, which he received shortly thereafter. (Id. at 6.) On November 17, 2009, plaintiff received his oral surgery consultation. (Id. at 5.) The oral surgeon opined that plaintiff would benefit from a full mouth reconstruction involving bone grafting, which would repair the bone defect and correct the placement of dental implants. (Id.) The oral surgeon also opined that plaintiff would benefit from a more supportive reconstruction bar. (Id.) He also informed plaintiff that he would have to stop smoking in order to undergo surgery. (Id.)

On December 19, 2009, plaintiff developed an abscess and infection in his right jaw and received antibiotics. (Id. at 7.) On December 28, 2009, during a follow-up examination, Dr. Sandhu noted that the swelling had subsided and reported no drainage inside plaintiff's mouth. (Id. at 8.) Plaintiff complained that he suffered pain while chewing. (Id.) Dr. Sandhu ordered plaintiff Ensure, a liquid nutritional supplement, and instructed him on oral hygiene and the risks of not taking his medication. (Id.)

On January 8, 2010, plaintiff complained of facial pain and requested an evaluation for permission to cover his face. (Id. at 9.) He also stated that his prescribed medication, Neurontin,

failed to alleviate his pain.[1] (Id.) On January 11, 2010, Dr. Gene Roxas issued an order allowing plaintiff to cover his face when the temperature dropped below 40 degrees. (Id. at 10.)

On January 13, 2010, defendant Jarrett requested an evaluation of plaintiff's mandible at Jefferson City Oral Surgery. (Id.) Defendant Jackson denied the referral and requested that plaintiff undergo a blood test to determine his nicotine usage. (Id.) On January 18, 2010, plaintiff stated that he had not smoked in 30 days and was willing to take a blood test. (Id. at 9.) On January 26, 2010, the test results indicated plaintiff's continued use of nicotine. (Id. at 11.) A nurse reviewed the test results with plaintiff and informed him that he needed to quit smoking to undergo surgery. (Id. at 13.) He told her that he would quit smoking that day and that he wanted to schedule another blood test. (Id.)

From February 9 to March 29, 2010, plaintiff refused to take his medication, Neurontin. (Doc. 45-1 at 14-82; Doc. 45-2 at 1-22.) On March 30, 2010, Dr. Roxas ordered that plaintiff discontinue Neurontin. (Doc. 45-2 at 24.)

On February 9, 2010, plaintiff took another blood test, and the results indicated that plaintiff had stopped using nicotine. (Doc. 45-1 at 13.) On February 11, 2010, plaintiff went into segregation because of his potential for self-harm. (Id. at 22.) He remained in segregation for at least 30 days. (Id. at 71.)

On February 16, 2010, defendant Jarrett again requested an evaluation of plaintiff's mandible. (Id. at 33.) Defendant Jackson approved, but Dr. Elizabeth Conley, the regional medical director for Corizon, questioned the medical necessity of the surgery. (Id. at 43.) On March 15, plaintiff requested information regarding the status of his surgery and scheduled a meeting with a doctor. (Id. at 77.) On March 17, 2010, because plaintiff could still chew and eat, the referral was denied. (Id. at 33.) Later that day, plaintiff refused to attend his scheduled meeting. (Id. at 77.)

On March 18, 2010, plaintiff complained that his jaw hurt due to a particularly forceful bite of food and that he could no longer chew. (Doc. 45-2 at 2.) The nurse noted that plaintiff had two titanium plates holding his lower jaw together. (Id.) Plaintiff stated that a loose screw caused the right side of his jaw to come apart. (Id.) The nurse noted the absence of tenderness, protrusion, and

---

[1] Neurontin, also known as Gabapentin, is used to prevent and control seizures. WebMD, http://www.webmd.com/drugs (last visited on October 16, 2012).

edema, and referred plaintiff to the dental department. (Id.) Plaintiff weighed 220 pounds. (Id.) On March 24, 2010, defendant Jarrett met with plaintiff and again deferred the surgery because of the lack of medical necessity. (Id.)

On April 25, 2010, plaintiff complained that he felt his jaw "pop" and that his jaw and the titanium rod felt disconnected. (Id. at 25.) He also complained of jaw pain. (Id.) A nurse noted that the right side of his mouth appeared swollen but that he could still open his mouth and speak. (Id.) On April 27, 2010, plaintiff met with defendant Jarrett and stated that he could not chew due to the loosening of the plate in his jaw. (Id. at 26.) Defendant Jarrett requested an oral surgery consultation, but defendant Jackson denied the request because no medical necessity had been established. (Id. at 27.)

On May 11, 2010, plaintiff again requested an oral surgery consult. (Id. at 28.) Defendant Jackson inquired about plaintiff's weight and requested his canteen log. (Id.) The next day, defendant Jackson approved the consult. (Id. at 29.)

On May 25, 2010, defendant Simmons evaluated plaintiff's mandible and the placement of his reconstruction plate. (Id. at 31.) Plaintiff stated that a plate had been placed in his jaw on December 11, 2008, but after two months, the plate was removed and replaced. (Id.) Plaintiff also complained of jaw pain and periodic infections that required drainage. (Id.) Defendant Simmons noted that plaintiff's mandible appeared relatively stable but had poor occlusion.[2] (Id.) He assessed that plaintiff's jaw had a functional problem and requested an evaluation for oral surgery. (Id. at 32.) However, because defendant Jackson did not to receive plaintiff's x-rays for review, he denied the request on June 10, 2010. (Id.)

On July 21, 2010, plaintiff complained of facial twitches and requested Neurontin. (Id. at 33.) On September 3, 2010, defendant Jackson approved a request for a Panorex x-ray scan for the evaluation of his mandibular plating. (Id. at 34.) On September 23, 2010, plaintiff received the Panorex x-ray scan.[3] (Id.)

---

[2] Occlusion is the contact between upper and lower teeth. Stedman's Medical Dictionary, 1355 (28th ed., Lippincott Williams & Wilkins 2006).

[3] A panorex is defined by defendants as "a two-dimensional dental x-ray that displays both the upper and lower jaws and teeth, in the same film." (Doc. 44 at 10.)

On September 16, 2010, defendant Jarrett took impressions of plaintiff's teeth for a partial upper denture and a mouth guard.  (Id. at 35.)  On October 7, 2010, plaintiff received his mouth guard, and defendant Jarrett took plaintiff's bite registration for his partial upper denture.  (Id. at 36.) On October 27, 2010, plaintiff received his denture.  (Id. at 39.)

On October 11, 2010, plaintiff requested and received a refill for Ensure, which he needed because he had no lower front teeth.  (Id. at 36-37.)  On October 14, 2010, defendant Jackson informed plaintiff that he found surgery unnecessary because plaintiff's weight remained stable.  (Id. at 38.)

On December 6, 2010, plaintiff experienced cold sensitivity in one of his teeth.  (Id.  at 40.) Defendant Jarrett found no evidence of decay and bonded the tooth surface with composite to eliminate the sensitivity.  (Id.)

On January 14, 2011, plaintiff again complained that his jaw hurt and that biting caused the right side of his jaw to fold.  (Id. at 41.)  On January 18, 2011, defendant Jarrett found that the arch bar stabilizing plaintiff's lower right mandible was loose and that plaintiff could not chew because of the resulting movement.  (Id.)  He recommended a liquid diet for 30 days, which plaintiff began the following day.  (Id.)  Defendant Jarrett also requested an oral surgery consultation, which defendant Jackson approved.  (Id.)

On February 15, 2011, plaintiff went to Jefferson City Oral Surgery.  (Id. at 41.)  Dr. Eric Bessey noted instability in plaintiff's right jaw during occlusion and the associated pain.  (Id.)  Dr. Bessey opined that plaintiff needed reconstructive surgery.  (Id. at 42.)  He proposed removing the infected screws from plaintiff's jaw and performing a bone graft using plaintiff's hip bone.  (Id.) Plaintiff admitted to smoking half a pack per day, and Dr. Bessey told him that he needed to quit prior to the bone graft procedure.  (Id.)

On February 18, 2011, plaintiff requested switching his prescription for Neurontin with Ultram.[4]  (Id. at 44.)  On March 3, 2011, defendant Jackson denied his request for a stronger pain medication.  (Id. at 45.)

---

[4] Ultram, also known as Tramadol, is used to help relieve moderate to moderately severe pain. WebMD, http://www.webmd.com/drugs (last visited on October 16, 2012).

On February 23, 2011, plaintiff complained that his lower jaw hurt and that he was unable to open his mouth. (Id. at 44.) Plaintiff weighed 210 pounds. (Id.) Dr. Michael Gilmore prescribed Tramadol. (Id.) Defendant Jarrett requested oral surgery for plaintiff, which defendant Jackson denied because he failed to receive surgical records and x-rays. (Id. at 45.)

On March 30, 2011, Dr. Gilmore discontinued plaintiff's liquid diet at his request. (Id. at 46.) On April 4, 2011, because he could not eat the entire regular diet, plaintiff requested a soft diet. (Id. at 47.)

On August 17, 2011, plaintiff complained of increased jaw pain after lunch the previous day. (Id. at 48.) He reported that his jaw folded when he applied pressure and that he could not bite. (Id.) He also reported that the pain radiated to his right ear. (Id.) A nurse noted slight swelling in his chin. (Id.) Defendant Jarrett recommended that plaintiff continue his medications and soft diet. (Id.) Plaintiff requested an x-ray because he thought a screw was loose, and the nurse referred him to the dental department. (Id.)

On August 23, 2011, defendant Jarrett recommended rejoining the loose plates in plaintiff's jaw to improve functionality. (Id. at 50.) Defendant Jarrett requested an oral surgery consultation, which defendant Jackson approved on September 13, 2011. (Id.)

On September 28, 2011, plaintiff complained of a toothache. (Id. at 51.) A nurse noted swelling on the right side of his jaw. (Id.) Plaintiff was prescribed Bactim, an antibiotic, and referred to the dental department. (Id.) The next day, defendant Jarrett requested a facial CT scan without contrast to evaluate plaintiff's mandible. (Id. at 52.)

On October 5, 2011, defendant Jackson approved the CT scan but also requested that plaintiff undergo a blood test to determine his nicotine usage. (Id.) The next day, plaintiff received the CT scan, which revealed that the plates were anchored on one side by three screws. (Id. at 55.) Two of the screws had fractured, and the other screw appeared either loose or infected. (Id.) Defendant Jarrett informed plaintiff of the scheduled blood test and advised him to stop smoking. (Id. at 53.)

On October 11, 2011, plaintiff met with Dr. Bessey to review the CT scan and discuss the risks and benefits of a hip graft. (Id. at 56.) He was advised to continue his soft diet and smoking cessation. (Id.)

On November 10, 2011, plaintiff received a blood test, and the results indicated that he had stopped using nicotine. (Id. at 57-58.) On November 23, 2011, defendant Jarrett requested reconstructive surgery for plaintiff, and defendant Jackson approved on November 30, 2011. (Id. at 59.)

On January 22, 2012, plaintiff complained that his mouth was infected and that he could taste drainage when he ate or rinsed his mouth. (Id. at 61.) A nurse observed redness in his chin but no drainage. (Id.) The next day, defendant Jarrett prescribed antibiotics. (Id. at 62.)

Plaintiff saw Dr. Bessey for a mandibular reconstruction consultation. (Id. at 59.) Dr. Bessey recommended University Hospital for the procedure, but the hospital had no surgeons willing to treat convicted felons. (Id. at 60.) On January 26, 2012, at the suggestion of the regional office, defendant Jarrett contacted Dr. Renner to discuss plaintiff's surgery, but the clinic had closed. (Id. at 62.) The next day, he faxed plaintiff's CT scan results and Dr. Bessey's notes to Dr. Renner. (Id. at 63.) On January 30, 2012, Dr. Renner's office informed that Dr. Renner had taken vacation that week and that he would receive plaintiff's information upon his return. (Id. at 64.)

On February 14, 2012, plaintiff complained that his jaw hurt and that the left side of his face was swollen and hot. (Id. at 65.) The nurse continued plaintiff on antibiotics and instructed him to gargle warm water and salt. (Id. at 66.) On February 15, 2012, defendant Jarrett requested a surgery consultation with Dr. Renner, which Defendant Jackson approved. (Id. at 66-67.)

On February 23, 2012, plaintiff complained of jaw pain that had increased since the expiration of his antibiotics order. (Id. at 68.) The nurse noted slight swelling on the right side of jaw and referred him to the dental department. (Id.) The next day, plaintiff reported that eating and talking increased the severity of the pain and that nothing alleviated his pain. (Id. at 69.) The nurse noted warmth and slight redness and informed plaintiff that the dental department had been notified. (Id.)

On March 1, 2012, defendant Jackson missed an appointment with plaintiff because he was unable to work that day. (Id. at 70.) On March 22, 2012, Dr. Renner met with plaintiff and requested a current CT scan on plaintiff's jaw and an evaluation by Dr. Jeff Jorgensen. (Id. at 67.) On March 24, 2012, Dr. Kendis Archer requested the CT scan and evaluation, which were approved. (Id. at 71-72.)

On March 25, 2012, plaintiff reported a painful protrusion from his gums. (Id. at 72.) A nurse noted that a sharp object could be felt through plaintiff's lower left gum. (Id. at 73.) The next day, plaintiff reiterated his complaint and added that his pain was pulsating. (Id. at 73-74.) Defendant Jarrett prescribed plaintiff antibiotics and advised him to apply heat. (Id. at 74.)

On April 6, 2012, plaintiff received a CT scan on his jaw. (Id. at 71.) The CT scan revealed no abscess collection, no acute fractures, and no problems with the submandibular and parotid glands. (Id.) On April 10, 2012, Dr. Jorgensen met with plaintiff and recommended microvascular reconstruction. (Id. at 72.) On April 13, 2012, plaintiff weighed 252 pounds. (Id. at 76.) On April 19, 2012, Dr. Archer requested a referral for the surgery. (Id.) On April 24, 2012, defendant Jarrett discontinued plaintiff's soft diet due to noncompliance. (Id. at 70.)

On April 30, 2012, the regional medical director found the procedure not medically necessary because plaintiff continued a regular diet and had gained weight. (Id. at 76-77.) The director also recommended monitoring plaintiff to determine the medical necessity of the procedure. (Id. at 77.)

On May 7, 2012, plaintiff met with Dr. Archer to discuss the referral for his surgery. (Id. at 80.) Dr. Archer informed plaintiff that his weight would be monitored and that the referral would be reevaluated if a significant changed occurred. (Id.) On May 30, 2012, plaintiff complained of jaw pain and requested a dental examination. (Id. at 81.)

On June 13, 2012, plaintiff again complained of jaw pain and swelling and reported that the screws were no longer attached to his jawbone. (Id. at 85.) A nurse noted slight swelling in the right side of his jaw and a deformed gum line and that he could only chew on the right side of his mouth. (Id.) On June 14, 2012, plaintiff weighed 236 pounds. (Id. at 82.) A nurse offered plaintiff a liquid diet, which he refused. (Id.)

On June 18, 2012, Dr. Paul Jones prescribed antibiotics. (Id. at 86.) The next day, plaintiff refused the antibiotics, complaining that the medication caused stomach pain. (Id.) On June 20, 2012, Dr. Jones discussed with plaintiff the denial of his surgery. (Id. at 83-84.) On June 27, 2012, plaintiff weighed 235 pounds. (Id.)

### IV.  SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).  A fact is "material" if it could affect the ultimate disposition of the case, and a factual dispute is "genuine" if there is substantial evidence to support a reasonable jury verdict in favor of the nonmoving party.  Rademacher v. HBE Corp., 645 F.3d 1005, 1010 (8th Cir. 2011).  The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences.  Scott v. Harris, 550 U.S. 372, 379 (2007).

### V. DISCUSSION

Defendants argue that plaintiff's claims of deliberate indifference are not supported by legally sufficient evidence.  Defendants further argue that plaintiff's claims of medical negligence are not cognizable constitutional claims.

**A. Count I**

In Count I of his complaint, plaintiff alleges that defendants Cabrera, Jackson, Perkins, Jarrett, and Simmons were deliberately indifferent to his medical needs.  Defendants argue that plaintiff has failed to support this claim with evidence sufficient to allow a reasonable jury to find in his favor.

The Eighth Amendment governs the treatment of prisoners and the conditions of their confinement, placing both duties and restraints on prison officers.  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  However, "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny."  Whitley v. Albers, 475 U.S. 312, 319 (1986).  For prison officials to violate the Eighth Amendment, the alleged deprivation must be sufficiently serious and the prison officials must have a sufficiently culpable state of mind.  Farmer, 511 U.S. at 834.  Specifically, for claims alleging the failure to provide medical care, prisoners must show that

(1) they suffered objectively serious medical conditions; and (2) prison officials knew of but deliberately disregarded those needs. Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000).

Defendants argue that plaintiff has failed to present sufficient evidence regarding the second, subjective component of the two-part test. "For the prison officials to be liable for deliberate indifference to a serious dental need, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Holden v. Hirner, 663 F.3d 336, 343 (8th Cir. 2011). Such evidence is absent from the record.

To the contrary, the proffered evidence before this court indicates unequivocally that plaintiff's needs were not at all disregarded. Plaintiff periodically made medical complaints to nurses. (See e.g., Doc. 45-2 at 2, 25, 65.) Sometimes the nurses themselves treated plaintiff, and other times the nurses arranged for plaintiff to receive appointments with doctors, including defendant Jarrett on multiple occasions. (Id.) The doctors evaluated plaintiff usually within a couple days of his complaint and offered treatment or referred him to doctors practicing outside the prison. (See e.g., id at 2, 25, 34, 40-41.) Many of these referrals were promptly approved. (See e.g., id. at 34, 41.) The reasons for denials included awaiting results of blood tests, concluding that petitioner continued to use tobacco, failing to receive medical records for review, and finding referrals not medically necessary. (Doc. 45-1 at 10, 33; Doc. 45-2 at 2, 32, 38, 45, 76-77.) Concerning plaintiff's requested reconstructive surgery, the doctors based their determinations of medical necessity on plaintiff's weight and his ability to eat. (Doc. 45-1 at 33; Doc. 45-2 at 76-77.)

In short, plaintiff failed to proffer sufficient evidence to allow a reasonable jury to find that defendants deliberately disregarded his condition. The record does not show that prison officials ignored his complaints or unreasonably refused him medical treatment. Disagreement with the course of treatment provided is not a sufficient basis for a claim of deliberate indifference. Kayser v. Caspari, 16 F.3d 280, 281 (8th Cir. 1994). Accordingly, defendants' motion for summary judgment regarding Count I is sustained.

**B. Count III**

In Count III plaintiff alleges that the policies, procedures, customs, and official actions of defendants Corizon and JIDS resulted in deliberate indifference to his medical needs. Defendants again argue that plaintiff has failed to support this claim with evidence sufficient to allow a reasonable jury to find in his favor.

Corporations acting under color of state law are liable under § 1983 for their own unconstitutional policies or customs. Sanders v. Sears, Roebuck & Co., 984 F.2d 972, 975-76 (8th Cir. 1993). "The proper test is whether there is a policy, custom or action by those who represent official policy that inflicts injury actionable under § 1983." Id. at 976.

Here, as discussed above, plaintiff has failed to show an underlying actionable injury under § 1983. When a plaintiff fails to provide evidence of an actionable injury, the plaintiff's claim against a corporation for its unconstitutional policies or customs also fails. Jackson v. Douglas, 270 F. App'x 462 (8th Cir. 2008). Accordingly, defendants' motion for summary judgment on Count III is sustained.

**C. Counts II and IV**

In Counts II and IV, plaintiff claims medical negligence under Missouri law. Defendants argue that medical negligence is not a cognizable claim under § 1983. However, defendants misconstrue plaintiff's state claims as claims of constitutional violations.

Plaintiff invokes supplemental subject matter jurisdiction under 28 U.S.C. § 1367 for his Counts II and IV state law claims. However, courts have the discretion to decline supplemental jurisdiction if the court has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine ... will point toward declining to exercise jurisdiction over the remaining state-law claims." Williams v. Hobbs, 658 F.3d 842, 853 (8th Cir. 2011). Because defendants have been granted summary judgment on plaintiff's federal claims, the court declines to exercise supplemental jurisdiction over the remaining, state law claims. Accordingly, Counts II and IV are dismissed without prejudice.

## VI.  CONCLUSION

An appropriate judgment order is issued herewith sustaining the motion of defendants Thomas Cabrera, Ernest Jackson, Jill Perkins, Robert Jarrett, Ervin Simmons, Corizon, Inc., formerly known as Correctional Medical Services, and Jackson Institutional Dental Services for summary judgment (Doc. 42) on Counts I and III, which will be dismissed with prejudice.  The state law claims of Counts II and IV are dismissed without prejudice.


　　　　　　　　　　　　　　　　　　　　/S/   David D. Noce            
　　　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**


Signed on November 13, 2012.